**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DARLENE TALTOAN, | ) | |
| | ) | CASE NO.  4:13CV2526 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Darlene Taltoan ("Taltoan") challenges the final decision of the Acting

Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42

U.S.C. § 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED

and the case REMANDED for further proceedings consistent with this decision.

**I.  Procedural History**

On April 14, 2010, Taltoan filed an application for SSI alleging a disability onset date of

May 1, 2003 and claiming she was disabled due to neck, shoulder, and arm limitations; and, depression.  (Tr. 176-177, 185, 203, 207.)  Her application was denied both initially and upon reconsideration.  (Tr. 134-138, 145- 147.)  Taltoan timely requested an administrative hearing. (Tr. 152.)

On April 23, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Taltoan, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28-63.) On August 13, 2012, the ALJ found Taltoan was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 13-22.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1- 4.)

## II.  Evidence

*Personal and Vocational Evidence*

Age fifty-one (51) at the time of her administrative hearing, Taltoan is a "person closely approaching advanced age" under social security regulations.[1]  *See* 20 C.F.R. § 416.963 (d). Taltoan has a 9th grade education and past work as a customer service representative.[2]  (Tr. 34-35, 56.)

*Hearing Testimony*

At the April 23, 2012 hearing before the ALJ, Taltoan testified to the following:

---

[1] Taltoan was forty-eight (48) years at the time the application was filed, which is defined as a "younger person" under social security regulations.  *See* 20 CFR § 416.963(c).  By the time of the hearing, she was fifty-one (51) years old and had, therefore, changed age categories to a "person closely approaching advanced age."  *See* 20 CFR § 416.963(d).

[2] Taltoan testified that she worked as a customer service representative for short periods of time in 2009 and 2010. (Tr. 36-38.)  However, the ALJ determined this was not "past relevant work" for purposes of social security regulations.  (Tr. 20.)

2

- She has a ninth grade education.  She is single and lives by herself in a ground floor apartment.  (Tr. 34-35.)

- In 2009 and 2010, she worked for about a month and half in seasonal customer service jobs.  In these jobs, she took orders over the phone and sat for most of the work day.  In addition, she earned self-employment income for about 6 to 7 months in 2009-2010 taking care of an elderly friend.  (Tr. 36-38.)  She has not worked since 2010.  (Tr. 35.)

- She is currently unable to work because she is in constant pain.  (Tr. 40, 44.)  She constantly feels pain in her neck, which sometimes radiates to her head, shoulder, arms, and legs.  (Tr. 44.)  In addition, she has very limited mobility in her neck, making it difficult for her to do the things she used to do in a timely manner.  Bending and lifting are difficult for her, as is getting back up after sitting down.  (Tr. 40-42.)  Her neck pain is aggravated by movement, stress, and bad weather.  (Tr. 44-45.)

- She also experiences muscle spasms in her neck and feet.  Approximately three to four times per month, her neck tightens up so much that she cannot move it at all.  Sometimes this condition will last all day.  (Tr. 51.)

- On a bad day, she has to lie down in a recliner.  She experiences about four bad days per month.  (Tr. 42-43.)  On a regular day, she could sit for 30 to 45 minutes before needing to stand up.  (Tr. 48.)  She would need to stand up for about 10 to 15 minutes before being able to sit back down.  (Tr. 48-49.)  Depending on the pain, she might be able to just stand still before sitting back down again.  (Tr. 53.)  However, if the pain were particularly bad, she might need to walk around for awhile before sitting back down.  (Tr. 53-54.)  She would probably need to walk around at least four times per day.  (Tr. 54.)

- She thinks she could lift a 10 pound bag of potatoes.  She would not be able to lift her grandchildren.  (Tr. 48.)

- She could only return to her previous seasonal customer service job if she was able to get up and move around.  She cannot sit for eight hours at a time.  She would also need to take off at least four days per month due to her pain.  (Tr. 41-43.)

- She takes prescription strength ibuprofen (500 and 800 mg), Prednisone, Flexeril, and Naproxen.  (Tr. 43, 51.)  She will be taking Humira as well.  (Tr. 43.)  The pain medication helps, but "the pain is just always there."  (Tr. 47.)  Her doctors have not recommended that she wear a neck brace or soft collar.  (Tr. 52.)

- She can make breakfast and get dressed, although it takes longer than normal to

3

put on her pants and socks due to her neck pain.  She does her household chores but, again, it takes a long time and sometimes can take a whole day.  She can run the vacuum cleaner; dust; mop the floor; and, scrub the shower and bathtub.  She does these chores herself because there is no one to help her and they have to get done.  It is painful and takes a long time, but she finds a way to do it.  (Tr. 45-47.)

- She does not drive because her neck pain limits her ability to do so safely.  (Tr. 35.)  A family member generally drives her to the grocery store.  She can walk short distances in the store, but it is painful.  (Tr. 47.)

- She does not go out much any more.  The only places she goes are to the grocery store and to church once per week.  (Tr. 49-50.)  Otherwise, she stays home and reads a lot.  (Tr. 49, 51-52.)

The VE testified Taltoan had past work as a customer service representative (semi-skilled, sedentary, SVP 4).  (Tr. 56.)  The ALJ then posed the following hypothetical to the VE:

For each hypothetical that I give you, please assume that we have an individual of the claimant's age and education and with that past job of customer service rep that you described.  Further assume that this individual is limited as follows:

For my first hypothetical, the individual can occasionally lift and/or carry, including upward pulling, 20 pounds; frequently lift and/or carry, including upward pulling, 10 pounds; stand and/or walk for approximately six hours per eight hour work day; and sit for approximately six hours per eight hour work day with normal breaks; but the individual must be able to alternate sitting and standing to relieve pain and discomfort.  And I do not anticipate that she would be off task, or if she would be off task, it would not be– it would be less than 10 percent of the day.  Push and pull is unlimited except what was indicated for lifting or carrying.  The individual can occasionally climb ramps and stairs, balance, and crawl.  The individual can never climb ladders, ropes, and scaffolds.

I'm going to do – all the other posturals would also be occasional. Okay.  So that will leave us with occasional climbing ramps and stairs, balance, crawl, stooping, crouching, kneeling.  Okay.  The individual should avoid exposure to all hazards, such as machinery and heights, and no driving.

And here's – I'm going to see if I can describe it this way for my manipulative limitations and reaching.  The individual can reach in front of her to do work, but she can do no overhead reaching or to the sides due to her inability to adequately move her neck. And that's because she can't move her neck to follow her arm motions when reaching above her head or to her sides. The

4

individual would be limited to occupations requiring only occasional peripheral
acuity because her peripheral vision is impaired secondary to her inability to
move her neck in any degree.  She has no communicative limitations.
And I'm going to phrase it this way, and you can tell me if you can work with it
or if I have to limit it further.  She can't do any activities that require a normal
range of motion of her neck.  And I may have already addressed this with the
peripheral vision and the reaching.

\* \* \*

Okay.  Could the hypothetical individual perform any of her past work as
actually performed or as generally performed?

(Tr. 57-59.)  The VE testified that such a person could perform Taltoan's past work, both as

actually and generally performed.  (Tr. 59.)

The ALJ then posed a second hypothetical that was the same as the first but added the

limitation that the individual would miss more than three days a month due to her impairment

and/or complications due to pain.  (Tr. 59.)  The VE testified that work would not be available

for such an individual.  (Tr. 59-60.)

For her third hypothetical, the ALJ kept "most of the limitations of my first hypothetical

except I'm going to put the individual at a sedentary level.  So she could lift up to 10 pounds

occasionally; stand or walk for approximately two hours per eight-hour work day; and sit for

approximately six hours per eight-hour work day."  (Tr. 60.)  The VE testified such an individual

would be able to perform Taltoan's past work.  (Tr. 60.)

Taltoan's attorney then posed a hypothetical that was the same as the ALJ's first

hypothetical but added the limitation that "at least three times a day when standing, she would

have to move away from the work bench or desk or she'd have to walk a little bit," i.e. for "at

least five minutes."  (Tr. 61.)  The VE testified that such an individual could probably perform

Taltoan's past work if that individual walks away from her work station for no more than five to

seven minutes.  (Tr. 61-62.)  He further stated that, if the hypothetical individual were away from her work station for more than seven minutes, no work would be available.  (Tr. 62.)

### III.  Standard for Disability

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Taltoan established medically determinable, severe impairments, due to

6

degenerative disc disease of the cervical and thoracic spine, chronic cervical flexion due to cervical anterior osseous bridging suspicious for ankylosis spondylitis, and, obesity; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 16.) Taltoan was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 16-21.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Taltoan was not disabled. (Tr. 20-21.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could

also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

Taltoan claims the ALJ's determination that her neck impairment does not meet or equal Listing 14.09(C)(2)[3] is not supported by substantial evidence.  Specifically, she maintains the medical evidence does, in fact, support a finding that she meets the Listing's requirements. Taltoan further argues that the decision must be vacated because "the ALJ's failure to cite any evidence that she considered in relation to 14.09 or to identify why she felt 14.09 was not met, or what parts of 14.09 were not met, deprived Ms. Taltoan of a fair opportunity to understand why her claim was denied."  (Doc. No. 14 at 16.)

Emphasizing there is "no heightened articulation standard" with regard to an ALJ's consideration of the Listings, the Commissioner argues the ALJ sufficiently addresses Listing 14.09(C)(2) by referencing it in the decision and noting that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment."  (Tr. 16.)   Finally, the Commissioner argues the ALJ's determination that Taltoan did not meet Listing 14.09(C)(2) is supported by substantial evidence.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 2010 WL 2294531 at * 3 (6th Cir.  June 7, 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the

---

[3]  As discussed *infra*, Listing 14.09(C)(2) requires a showing of anklyosing spondylitis with (1) fixation of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30 degrees or more flexion (but less than 45 degrees) measured from the vertical position (zero degrees), and (2) involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.  *See* 20 C.F.R. Pt. 404, subpt. P, App. 1, § 14.09(C)(2).

regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  A claimant must satisfy all of the criteria to "meet" the listing.  *Id.*; *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  However, a claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).  Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 3-4 (6th Cir. April 1, 2011); *Smith-Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999 at * 5-6 (6th Cir. Sept. 8, 2014); *Hunter v. Comm'r of Soc. Sec.*, 2011 WL 6440762 at * 3-4 (N.D. Ohio Dec. 20, 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *See Reynolds,* 2011 WL 1228165 at * 4-5;  *Marok v. Astrue*, 2010 WL 2294056 at *3 (N.D. Ohio Jun. 3, 2010); *Waller v. Comm'r of Soc. Sec.*, 2012 WL 6771844 at * 3 (N.D. Ohio Dec. 7, 2012); *Keyes v. Astrue*, 2012 WL 832576 at * 5-6 (N.D. Ohio March 12, 2012).

Here, Taltoan presented medical evidence indicating a long history of neck pain and stiffness. In December 2006, Taltoan presented to Cybele A. Wassef, M.D., complaining of neck pain and stiffness "with an acute onset about 3 ½ years ago, and a gradually progressive course."[4] (Tr. 308.) At that time, Taltoan rated her neck pain as ranging from 6 to 8 on a scale of 10 and described it as "constant, aching in character, and worse with activity." *Id.* On physical examination, Dr. Wassef noted Taltoan "kept her neck slightly flexed and had significant limitation of the range of motion of the cervical spine, having to turn her whole body to look to the side." (Tr. 309.) She further observed that Taltoan's "cervical spine range of motion was severely limited, with flexion 20 degrees, extension 5 degrees, rotation 15 degrees, and side flexion 5 to 10 degrees." *Id.* Dr. Wassef also noted that recent x-rays of Taltoan's cervical spine revealed "moderate degenerative changes throughout." (Tr. 308.) As relevant to Taltoan's neck condition, Dr. Wassef diagnosed "probable ankylosing spondylitis;" ordered HLA-B27 testing;[5] and, referred Taltoan for a rheumatological consultation with Magdy Iskander, M.D., to "confirm the diagnosis of ankylosing spondylitis." (Tr. 309-310.)

In January 2007, Taltoan returned to Dr. Wassef for a follow-up appointment. (Tr. 306-307.) Dr. Wassef reported Taltoan's HLA-B27 testing was negative but noted she "continues to

---

[4] Taltoan also complained of left shoulder and left wrist pain, left hip pain, and numbness and tingling in both hands, more marked on the right side. (Tr. 308.) As these conditions are not directly relevant to Listing 14.09(C)(2), they will not be discussed in detail herein.

[5] Ankylosing spondylitis is a chronic inflammatory disease that primarily causes pain and inflammation of the joints between the vertebrae of the spine and the sacroiliac joints. (Tr. 436.) Medical records in Taltoan's file indicate that HLA-B27 is "strongly associated with" ankylosing spondylitis. *Id.* However, those same records note that HLA-B27 results "are not intended to be used as the sole means for clinical diagnosis or patient management decisions." (Tr. 437.)

have significant limitation of the range of motion of the cervical spine." (Tr. 306.) Dr. Wassef also remarked that Taltoan was not able to see Dr. Iskander because he was not covered by Taltoan's insurance. *Id.* Dr. Wassef diagnosed "seronegative spondyloarthropathy versus diffuse idiopathic skeletal hyperostosis (DISH)," and recommended continued physical and occupational therapy as well as a home exercise program. (Tr. 307.)

Examinations in January 2008 and March and September 2009 reflect continued neck pain, stiffness, and severely reduced range of motion. (Tr. 303, 313, 314.) An x-ray of Taltoan's cervical spine in March 2009 showed spondylitic changes, including fusion of C6-C7, and degenerative disc disease. (Tr. 316.)

On May 4, 2010, Taltoan presented to Nanette Vandevender, D.O. for evaluation of her neck condition. (Tr. 359-360.) Dr. Vandevender noted a past history of chronic cervical flexion issues, anemia, and depression. (Tr. 359.) On physical examination, she observed that Taltoan's neck is "chronically flexed forward- limited range of motion- tight paraspinal." *Id.* She assessed chronic cervical flexion; depression; anemia; and, colonoscopy with biopsy consistent with Chrohn's ileitis. (Tr. 360.) Several days later, Taltoan underwent x-rays of her cervical, lumbar, and thoracic spines. (Tr. 403-405.) The x-ray of Taltoan's cervical spine showed "anterior osseous bridging suspicious for ankylosing spondylitis." (Tr. 403.) The x-ray of her lumbar spine revealed moderate to severe degenerative changes throughout the posterior elements of the lumbar spine. (Tr. 404.) Finally, the x-ray of Taltoan's thoracic spine showed early degenerative changes without evidence of acute osseous pathology. (Tr. 405.)

Taltoan thereafter underwent an MRI of her cervical spine on July 13, 2010. (Tr. 400-401.) This MRI revealed (1) minor degenerative changes without significant spinal stenosis; (2)

mild neural foraminal narrowing at C7-T1 on the left; and, (3) straightening of the normal lordotic curvature.[6]  (Tr. 401.)

On August 20, 2010, Taltoan underwent a consultative orthopedic examination by Brenda Stringer, M.D.  (Tr. 329-338.)  Taltoan reported "severe neck problems," stating she is "unable to move her neck to the right or left or look up or any further down than she is already looking." (Tr. 329.)  She indicated that, because of the stiffness in her neck, her shoulders hurt, especially if she raises her arms.  *Id.*  Taltoan stated that "one side is not consistently worse than the other," and that "[i]t just depends on what day it is and she has better days than worse days as some days where she feels like she cannot do anything."  *Id.*  She reported that any kind of medication, even over-the-counter medication, makes her sleepy and doesn't "help her problems so she is not taking anything."  *Id.*

On examination, Dr. Stringer observed that Taltoan "walks with her head angled down at approximately 30-degree angle, which produces a somewhat tentative gait."  (Tr. 331.) Taltoan's gait was not unsteady, lurching, or unpredictable, however, and she did not require the use of handheld assistive device.  *Id.*  Examination of Taltoan's cervical spine revealed tenderness over the spinous process.  *Id.*  Dr. Stringer also noted (1) "evidence of bilateral severe paraspinal muscle spasm, which appears to be involuntary," and, (2) "markedly decreased range of motion of the cervical spine."  *Id.*  Range of motion testing revealed that flexion of Taltoan's

---

[6]  It also revealed a left thyroid mass.  (Tr. 401.)  A follow-up ultrasound on July 19, 2010 found multinodular thryoid gland with the largest thyroid nodule on the left lobe measuring 1.5 cm. and the nodules on the right measuring less than 1 cm.  (Tr. 399.)  A follow-up ultrasound of the left-sided nodule was conducted on September 21, 2010.  (Tr. 397-398.)  It found normal radioiodine uptake and multinodular thyroid gland.  (Tr. 397.)  It recommended monitoring the stability of the left-sided nodule and stated that a "thyroid biopsy in the future should be done on the basis of ultrasound criteria."  *Id.*

13

cervical spine was limited to thirty degrees.  (Tr. 335.)  Range of motion testing in Taltoan's

shoulders caused complaints of pain in her back.  (Tr. 331.)  Dr. Stringer also noted mild to

moderate bilateral paravertebral muscle spasms in Taltoan's dorsolumbar spine, as well as

tenderness to the paraspinal muscles and the spinous process of the lumbar spine.[7] (Tr. 331.)

Based on the above, Dr. Stringer assessed the following: (1) "Cervical pain and decreased

range of motion with evidence of severe bilateral muscle spasms and mild generalized muscle

weakness;" and, (2) "History of bilateral myalgias of the thigh and mild low back pain with

evidence of bilateral mild to moderate paravertebral muscle spasm in the lumbar spine with

again generalized weakness."  (Tr. 332.)  She also noted that, although Taltoan's hearing, speech

and sight were within normal limits, "her peripheral vision was impaired secondary to her

inability to move her neck to any degree."  *Id*.

Dr. Stringer concluded that Taltoan could sit for an hour, "especially if given the

opportunity to shift position;" and, stand for at least thirty minutes.  (Tr. 332.)  She also found

that Taltoan "was able to walk with an unusual gait due to her neck being flexed at a 30 degree

angle and I would estimate that she could walk for 2 - 4 blocks in this fashion."  *Id.*  Dr. Stringer

offered that Taltoan's upper extremity functions were intact but "because of her inability to

adequately move her neck, she could not follow her arm motions when reaching above her head

or to the sides."  *Id.*  Dr. Stringer further opined that she did "see an indication for limitation of

---

[7] Dr. Stringer ordered x-rays of Taltoan's cervical, dorsal, and lumbar spines.  (Tr. 338.)
The cervical spinal x-ray showed moderate degenerative changes throughout with calcification
of the anterior spinal ligament throughout the cervical spine.  *Id.*  The dorsal spinal x-ray
showed minimal spondylosis and osteoarthrosis, as well as minimal dorsal spine scoliosis with
the convexity of the curve to the right.  *Id.*  Finally, the lumbar spinal x-ray showed marked
osteoarthritis in the sacroiliac joints.  *Id.*

physical activities as would involve any activity that would require normal range of motion of the neck and normal peripheral vision, any activity that would require any heavy lifting, pulling, pushing, or carrying and activity that would require prolonged sitting or standing without an opportunity to change position." (Tr. 333.)

On September 22, 2011, Taltoan presented to the Midlothian Free Health Clinic ("Midlothian") with complaints of neck pain and stiffness; lower back pain; and, pain in her upper extremities. (Tr. 532.) She reported neck stiffness for the past eight years; tight neck muscles; and limited range of movement in her neck. *Id.* On October 6, 2011, Taltoan presented to the St. Elizabeth Ambulatory Care Clinic ("St. Elizabeth") for treatment of her neck and lower back pain. (Tr. 519-521.) Examination showed "significant ankylosed cervical spine with practically no [range of motion]." (Tr. 521.) Taltoan was diagnosed with chronic cervical pain, as well as multinodular thryoid, anemia, and hyperlipidemia. (Tr. 519.) She was prescribed Ibuprofen 400 mg. and referred for a rheumatology consult. (Tr. 521.)

On October 27, 2011, Taltoan returned to Midlothian and reported neck pain radiating between her shoulder blades and lower back pain radiating down her right leg. (Tr. 533.) She was prescribed Decadron, Flexeril and Vicodin. *Id.* Additional MRIs were ordered of Taltoan's cervical and lumbar spines. *Id.* The MRI of Taltoan's cervical spine showed mild spondylitic changes and noted the findings were "stable when compared with the previous" MRI in July 2010. (Tr. 534.) The MRI of Taltoan's lumbar spine showed no abnormalities, other than incidental hemangiomas in the vertebral bodies of L5, L3, L2, L1 and T12. (Tr. 535-536.)

Taltoan returned to St. Elizabeth on November 28, 2011, where it was noted that she had been prescribed steroids and Lortab. (Tr. 489-492.) On examination, Taltoan showed decreased

range of motion in her neck in all directions with stiffness and muscle spasms. (Tr. 492.)  She also exhibited decreased range of motion in her bilateral shoulders.  (Tr. 493.)  Taltoan was noted as "doing well with present meds" and continued on Flexeril, Decadron, and Lortab.  (Tr. 494.)  It was also noted that she had a pending rheumatology consult scheduled in January 2012. *Id*.

On January 17, 2012, Taltoan presented to David Regule, M.D., at St. Elizabeth for treatment of her back and neck pain and to rule out ankylosing spondylitis.  (Tr. 477.)  Dr. Regule noted that Taltoan had progressive stiffness and observed that "stiffness looks chronic and unchanging on daily basis." (Tr. 438.)  Although he noted that Taltoan had previously tested negative for HLA-B27, he reviewed her imaging results and concluded "they did look very suspicious for AS [ankylosis spondylitis]."  (Tr. 442.)  He further stated that "I do think this looks like AS (question if still active) so I waited for inflammatory markers to return which came back as high +, therefore likely active."[8]  (Tr. 443.)  She was diagnosed with ankylosing spondylitis, polyarthropathy, back pain, and high medication use.  (Tr. 446, 473.)

Based on the above, the ALJ determined at step two of the sequential evaluation process that Taltoan suffers from the following severe impairments: degenerative disc disease of the cervical and thoracic spine; chronic cervical flexion due to cervical anterior osseous bridging suspicious for ankylosing spondylitis; and, obesity.  (Tr. 16.)  Thus, at step three, the ALJ was required to consider whether Taltoan's impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1.

---

[8]  Taltoan's HLA-B27 result was negative but her C-reactive protein and sedimentation rate results were high.  (Tr. 435.)

At the hearing before the ALJ, Taltoan expressly argued that her neck impairment met or

equaled Listing 14.09(C)(2).  (Tr. 32-33.)  This Listing provides as follows:

**14.09 Inflammatory arthritis**.  As described in 14.00D6.[9]  With:

* * *

(C) Ankylosing spondylitis or other spondylorathropathies with:

* * *

(2) Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by
appropriate medically acceptable imaging and measured on physical examination
at 30 degrees or more of flexion (but less than 45 degrees) measured from the
vertical position (zero degrees), and involvement of two or more organs/body
systems with one of the organs/body systems involved to at least a moderate level
of severity.

20 C.F.R. Pt. 404, Subpart P., App. 1.

In the decision, the ALJ determined that Taltoan "does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and

416.926)."  (Tr. 16.)  The entirety of the ALJ's step three analysis is as follows:

No treating or examining physician has indicated findings that would satisfy the
severity requirements of any listed impairment.  Considered individually and in
combination, the claimant's impairments did not meet or medically equal a

---

[9] Listing 14.00D6 states that: "The spectrum of inflammatory arthritis includes a vast array of
disorders that differ in cause, course, and outcome.  Clinically, inflammation of major
peripheral joints may be the dominant manifestation causing difficulties with ambulation or
fine and gross movements; there may be joint pain, swelling, and tenderness.  The arthritis may
affect other joints, or cause less limitation in ambulation or the performance of fine and gross
movements.  However, in combination with extra-articular features, including constitutional
symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss), inflammatory
arthritis may result in an extreme limitation."  *See* Listing 14.00D6(a).  This Listing further
provides that: "In adults, inflammatory arthritis involving the axial spine may be associated
with disorders such as: * * * (ii) Ankylosing spondylitis."  *See* Listing 14.00D6(b).

17

listing.  The undersigned reached this finding after consideration of all the listed
impairments, particularly Listings 1.04, 12.04, and 14.09.

(Tr. 16.)  The ALJ does not provide any further step three analysis of Taltoan's severe cervical

spine impairment.  Notably, the decision does not discuss the medical evidence concerning this

impairment and compare it to the criteria for Listing 14.09, nor does it explain how the evidence

fails to met or equal that Listing.  Rather, the ALJ decision simply states, summarily and without

explanation, that Taltoan's severe cervical spine impairment does not satisfy the "severity of any

listed impairment" because "no treating or examining physician has indicated findings" that

would satisfy a listing.

In this regard, the instant case is analogous to *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL

1228165 (6th Cir. April 1, 2011).  In *Reynolds*, the ALJ determined at step two of the sequential

evaluation process that the claimant had both severe physical and mental impairments.  At step

three, the ALJ conducted a thorough analysis of the claimant's mental impairment but "[n]o

analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in

his finding of a severe 'back pain' impairment) met or equaled a Listing under Section 1.00,

despite his introduction concluding that they did not." *Id*. at * 3.   The Sixth Circuit found this

was reversible error, explaining that:

> Ultimately, the ALJ erred by failing to analyze Reynolds' physical
> condition in relation to the Listed Impairments.  Put simply, he skipped an
> entire step of the necessary analysis.  He was required to assess whether
> Reynolds met or equaled a Listed Impairment . . . but did not do so.
>
> * * *
>
> The ALJ's error was not harmless, for the regulations indicate that if a
> person is found to meet a Listed Impairment, they are disabled within the
> meaning of the regulations and are entitled to benefits; no more analysis is
> necessary.  20 C.F.R. § 404.1520(a)(4)(iii).  Therefore, if the ALJ had

18

properly analyzed Step Three, and had found Reynolds met Listing 1.04, she would receive benefits regardless of what the ALJ's conclusion would have been at Steps Four and Five.  Additionally, in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing.

**In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and given an explained conclusion, in order to facilitate meaningful judicial review.**  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.  *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3rd Cir. 2000).  As the Third Circuit explained, "[b]ecause we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning" supporting the determination that Reynolds' severe impairments do not meet or medically equal a listed impairment.  *Burnett*, 220 F.3d at 120.

*Id.* at * 3-4 (emphasis added).  Since *Reynolds*, numerous district courts have vacated and remanded ALJ decisions because of the failure to conduct a meaningful step three analysis which evaluates the medical evidence, compares it to the applicable listing, and provides an "explained conclusion" as to why the claimant's impairments fail to meet or equal a listed impairment.  *See e.g. Jones v. Comm'r of Soc. Sec.*, 2014 WL 4715727 at *10-11 (N.D. Ohio Sept. 22, 2014); *Salah v. Comm'r of Soc. Sec.*, 2013 WL 3421835 at * 5-9 (N.D. Ohio July 8, 2013); *Waller v. Astrue*, 2012 WL 6771844 at * 2-5 (N.D. Ohio Dec. 7, 2012) *adopted*, 2013 WL 57046 (N.D. Ohio Jan. 3, 2013); *May v. Astrue*, 2011 WL 3490186 at * 7-10 (N.D. Ohio June 1, 2011) *adopted*, 2011 WL 3490229 (N.D. Ohio Aug. 10, 2011); *Keyes v. Astrue*, 2012 WL 832576 at * 5-6 (N.D. Ohio March 12, 2012); *Hunter v. Astrue*, 2011 WL 6440762 at * 3- 4 (N.D. Ohio Dec. 20, 2011); *Marok v. Astrue*, 2010 WL 2294056 at * 5 (N.D. Ohio June 3, 2010); *Hakkarainen v. Astrue*, 2012 WL 398595 at * 10-13 (N.D. Ohio Jan. 19, 2012) *adopted* 2012 WL 396970 (N.D. Ohio Feb. 7, 2012); *Shea v. Astrue*, 2012 WL 967088 at * 8-11 (N.D. Ohio Feb. 13, 2012)

19

*adopted* 2012 WL 967072 (N.D. Ohio March 21, 2012).

In the instant case, the ALJ failed to sufficiently articulate how she reached her conclusion that Taltoan's cervical spine impairment did not meet or equal a Listed Impairment. The decision states that the ALJ considered Listing 14.09, but does not discuss the requirements a claimant must meet or medically equal to satisfy that Listing or compare those requirements with the medical evidence of record. Indeed, the ALJ does not discuss any of the medical evidence of record in the context of the requirements of Listing 14.09. This is particularly problematic in light of the fact that the record does contain evidence that raises a substantial question as to whether Taltoan could qualify as disabled under Listing 14.09(C)(2), including Dr. Regule's January 2012 diagnosis of ankylosing spondylitis (Tr. 443, 446, 473); Dr. Stringer's finding that flexion of Taltoan's cervical spine is 30 degrees (Tr. 335); and, evidence suggesting severe back, shoulder, and hip pain; numbness and tingling of Taltoan's hands; thyroid issues; limited peripheral vision; and anemia (Tr. 303, 329-338, 397-401, 491-493, 445.) *See Smith- Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999 at * 5 (6th Cir. Sept. 8, 2014) (stating that "[t]he ALJ should discuss the relevant listing . . . where the record raises a 'substantial question as to whether [the claimant] could qualify as disabled' under a listing") (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *Burbridge v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 412, 415 (6th Cir. July 15, 2014) (noting that, at step three, "an ALJ must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record") (quoting *Reynolds, supra*).

While the decision does state, summarily, that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment," the

20

Court finds this is insufficient to satisfy the ALJ's duty to discuss the evidence and provide an "explained conclusion." *Reynolds*, 2011 WL 1228165 at * 4. Indeed, at least one other district court within this Circuit has remanded for a "more thorough" step three analysis where an ALJ used identical language but failed to provide any further explanation. *See e.g., Jones v. Comm'r of Soc. Sec.*, 2014 WL 4715727 at * 11 (N.D. Ohio Sept. 22, 2014) (finding that ALJ's statement that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment" was insufficient to allow the Court to conduct a meaningful review). Similarly, here, the Court finds the ALJ's step three analysis fails to provide an articulate discussion of the medical evidence in relation to the listing requirements, and thereby deprives the Court of a meaningful opportunity for judicial review.

The Commissioner argues the ALJ's step three determination should be upheld because the medical evidence does not establish that Taltoan's spinal impairment satisfied the criteria for Listing 14.09(C)(2). The Commissioner refers to specific medical evidence in the record in support of her position. (Doc. No. 16 at 15-19.) Unfortunately, the ALJ included no such analysis in the decision and the Court cannot engage in *post hoc* rationalizations. *See S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge the propriety of agency action "solely by the grounds invoked by the agency"). As this Court has previously observed, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *Waller*, 2012 WL 6771844 at * 3. *See also May*, 2011 WL 3490186 at * 9.

Moreover, the ALJ's failure to explain how she reached her conclusion that Taltoan's cervical spine impairment does not meet or medically equal a Listing is not harmless error

21

because, if Taltoan is found to meet a Listed Impairment, she would be disabled within the meaning of the regulations and entitled to benefits without any further additional analysis. 20 C.F.R. § 404.1520(a)(4)(iii).  *See also Reynolds*, 2011 WL 1228165 at * 4.  Further, as noted *supra*, Taltoan did submit medical evidence indicating a diagnosis of ankylosing spondylitis (Tr. 443, 446, 473); and, fixation of the cervical spine at 30 degrees (Tr. 335).  Moreover, there is at least some evidence in the record suggesting involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity, including evidence regarding chronic back, shoulder and hip pain; numbness and tingling of Taltoans' hands, thyroid issues; and, anemia.  (Tr. 303, 329-338, 397-401, 491-493, 445.)

In sum, the Court finds the ALJ failed to evaluate the medical evidence regarding Taltoan's severe cervical spinal impairment and compare it to the requirements for Listing 14.09.  As such, the ALJ's decision deprives this Court of any ability to conduct a meaningful review as to whether the regulations were followed.  Because the Court cannot discern the reasons for the ALJ's decision, it is recommended that this matter be remanded for a more thorough step three determination regarding Taltoan's cervical spinal impairment.[10]

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision is VACATED and the case is REMANDED,

---

[10]  In the interest of judicial economy, the Court will not address Taltoan's remaining assignments of error.

22

pursuant to 42 U.S.C. § 405(g) sentence four for further proceedings consistent with this opinion.

IT IS SO ORDERED.


<u>/s/ Greg White</u>
U.S. Magistrate Judge

Date: <u>November 6, 2014</u>